# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. <u>R.</u> 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0086-20T4

STATE OF NEW JERSEY,
IN THE INTEREST
OF L.L., a juvenile.

_____

Submitted December 16, 2020 – Decided January 12, 2021

Before Judges Alvarez and Sumners.

On appeal from the Superior Court of New Jersey, Family Part, Chancery Division, Middlesex County, Docket Nos. FJ-12-0992-19; FJ-12-0835-19; FJ-12-0763-19.

Tyler Dougherty argued the cause for appellant L.L. (Rutgers Criminal and Youth Justice Clinic, attorneys; Tyler Dougherty, on the briefs).

Joie D. Piderit argued the cause for respondent (Yolando Ciccone, Middlesex County Prosecutor, attorney; Joie D. Piderit, Assistant Prosecutor, of counsel and on the brief).

PER CURIAM

L.L. appeals the Family Division's July 24, 2020 order denying without

prejudice his motion to modify his commitment to the Juvenile Justice

Commission (JJC). L.L. contends that due to his medical condition – congenital heart defect, high blood pressure, asthma, amplified musculoskeletal pain syndrome (AMPS), and seizure disorder – he should be immediately released from custody to mitigate the threat posed to him by COVID-19 and to allow him to treat his AMPS. We affirm.

Nineteen-year-old L.L.'s extensive involvement with the criminal justice system culminated in his commitment to the JJC on June 14, 2019 for concurrent sentences of two years following guilty pleas to violation of probation (VOP), N.J.S.A. 2C:45-3(a)(4) and 2C:45-3(b), on FJ-12-763-19, and third-degree receiving stolen property (a motor vehicle), N.J.S.A. 2C:20-7(a), on FJ-12-992-19, and a consecutive eighteen-month sentence for third-degree theft of movable property (a motor vehicle), N.J.S.A. 2C:20-3(a), on FJ-12-835-19.[1] His medical condition was made known to the court at sentencing.

Approximately a year after his commitment, L.L moved for "immediate release from [JJC] custody in order to ensure his medical safety." L.L. contended he experienced delays in getting his inhaler from the nurse on duty.

---

[1] L.L prior delinquency adjudications were for: fourth-degree aggravated assault on a school official, N.J.S.A. 2C:12-1(b)(5)(d); disorderly persons criminal mischief, N.J.S.A. 2C:17-3(a); VOP and third-degree aggravated assault under N.J.S.A. 2C:12-1(b)(7); and VOP and third-degree aggravated assault on a care worker, N.J.S.A. 2C:12-1(b)(5)(k). (Da70-72).

He also maintained the dormitory arrangements have him sleeping in a large room with about fourteen other residents, increasing the risk of COVID-19 infection.

At the July 21, 2020 motion hearing, L.L.'s counsel contended his medical ailments required regular visits with outside medical specialists, causing "significant issues with [his] care in terms of getting access to . . . specialists, especially during the COVID-19 epidemic."  In support, affidavits and declarations from various physicians generally asserted that residents in detention facilities, such as L.L., are at risk for COVID-19 outbreaks.  Dr. Noel Bansil, L.L.'s  pediatrician, noted in a brief April 28, 2020 letter, that "[t]he current pandemic of COVID-19 has put certain population groups a[t] a high risk for infection . . . [L.L.] with all his pre-existing conditions is definitely susceptible.  It is without any doubt that he will be safer at home."  Dr. Vikram Bhise, Chief of the Division of Child Neurology and Neurodevelopmental Disabilities at Robert Wood Johnson University Hospital, who has treated L.L.'s AMPS since 2012, wrote a May 12, 2020 letter to the court recommending that L.L. enter an AMPS rehabilitation program at Children's Specialized Hospital in New Jersey or Children's Hospital of Philadelphia that is only available for persons under twenty-one years old.  According to Dr. Bhise, due to lengthy

wait times, L.L. "may not be able to access the program if he is released in early 2022" which could "negatively affect" him for the rest of his life. The doctor stated treatment of L.L.'s "AMPS would be better met if he were able to access these services." L.L.'s mother certified that in the event of his release, he would live with her in Pennsylvania where he would have his own bedroom and bathroom.

In the five to six months leading up to his motion, L.L. did not have any disciplinary infractions and was transferred to a medium security facility due to his good behavior. Prior to that, L.L. had received seven disciplinary violations, according to the State.

The State presented a May 19, 2020 certification of Jennifer LeBaron, Ph.D., Acting Executive Director of the JJC, attesting that extraordinary measures have been taken to address COVID-19 issues. Dr. LeBaron explained that the JJC provided "universal testing of its staff and residents . . . daily temperature screening and masks for all residents; temperature checks and face masks for anyone entering a facility; enhanced cleaning and sanitizing protocols; reduced person-to-person contact; and quarantining of residents who test positive, among other steps."

A-0086-20T4

Three days after the hearing, the court issued an order and written opinion denying L.L.'s motion to be released.  L.L. appealed.

About a week before appellate argument, L.L. moved under Rule 2:5-5(b) to supplement the record to include his updated medical condition and treatment and data reflecting increased COVID-19 infection rates at JJC facilities.  This information was not available at the trial court's hearing.  We granted the motion.

In a December 4, 2020 letter, Dr. Bhise contended that based on his November 13, 2020 in-person evaluation of L.L., he learned the JJC had stopped giving L.L. his gabapentin medication contrary to his April 2020 recommendation to increase the medication's dosage.  Dr. Bhise renewed his recommendation for L.L.'s participation in the AMPS rehabilitation program and reported that his staff has "made several attempts to communicate with the [JJC] [r]esidential staff to help facilitate an appointment to no avail."  Defendant contends that between the trial court's July 21, 2020 hearing and  December 6, 2020, an additional twenty-four residents tested positive for COVID-19, an approximately ninety-six percent increase, and an additional seventy-five JJC staff members tested positive for COVID-19, a three hundred percent increase.

In a December 15, 2020 letter, L.L.'s counsel advised that L.L. was moved in August 2020, to a lower-security residential facility based on his good

behavior. R. 2:6-11(e).  In addition, counsel detailed that since October 30, 2020, L.L. has had three infirmary visits and two separate hospital visits due to extreme facial swelling and chest pains.  As the date of the letter, L.L. remained in the infirmary.

Appellate review of a trial court's decision to modify a sentence is based on an abuse of discretion standard.  State ex rel. S.B., 333 N.J. Super. 236, 241, 246 (App. Div. 2000); see also In re Request to Modify Prison Sentences, Expedite Parole Hearings, & Identify Vulnerable Prisoners, 242 N.J. 357, 390 (2020) (holding that "[a] reviewing court will not overturn a final agency action unless it is arbitrary, capricious, or unreasonable.").  Due to its special expertise, we must "defer to the [family] court's determinations 'when supported by adequate, substantial, credible evidence.'"  New Jersey Div. of Child Prot. & Permanency v. Y.A., 437 N.J. Super. 541, 546 (App. Div. 2014) (citation omitted).  In accordance with N.J.S.A. 2A:4A-45(a), the Family Division retains continuing jurisdiction over a juvenile's "commitment or incarceration" and can "substitute any disposition otherwise available [under N.J.S.A. 2A:4A-43]."  Thus, it can "change or modify an order of disposition at any time."  State in Interest of R.M., 141 N.J. 434, 453 (1995) (quoting R. 5:24-6).  The following factors are  considered to determine whether to commit a youth to JJC's custody:

(1) The nature and circumstances of the offense;
(2) The degree of injury to persons or damage to property caused by the juvenile's offense;
(3) The juvenile's age, previous record, prior social service received, and out-of-home placement history;
(4) Whether the disposition supports family strength, responsibility and unity and the well-being and physical safety of the juvenile;
(5) Whether the disposition provides for reasonable participation by the child's parent, guardian, or custodian, provided, however, that the failure of a parent or parents to cooperate in the disposition shall not be weighed against the juvenile in arriving at an appropriate disposition;
(6) Whether the disposition recognizes and treats the unique physical, psychological, and social characteristics and needs of the child;
(7) Whether the disposition contributes to the developmental needs of the child, including the academic and social needs of the child where the child has intellectual disabilities or learning disabilities;
(8) Any other circumstances related to the offense and the juvenile's social history as deemed appropriate by the court;
(9) The impact of the offense on the victim or victims;
(10) The impact of the offense on the community; and
(11) The threat to the safety of the public or any individual posed by the child.

[N.J.S.A. 2A:4A-43].

Our Supreme Court recently recognized that considering modification of a juvenile's sentence due to "the ongoing COVID-19 crisis and its impact on the individual's health condition" is consistent with N.J.S.A. 2A:4A-43(a)(4).  In re Request to Modify Prison Sentences, 242 N.J. at 370.  In addition to other factors

listed in N.J.S.A. 2A:4A-43, the youth's conduct while in JJC custody should be considered. Id. at 395. In considering Rule 3:21-10(b), which sets forth the procedure for reduction or change of an adult inmate's sentence due to illness or infirmity, the Court noted inmates must present evidence of "a physical ailment or weakness — and the increased risk of harm incarceration poses to that condition[,]" and that "[a] generalized fear of contracting an illness is not enough." In re Request to Modify Prison Sentences, 242 N.J. at 379.

In this appeal, L.L. argues the trial court's denial of his release request did not consider his "unique and credible medical concerns" that are exacerbated should he contact COVID-19, and it abused its discretion by not upholding the juvenile code, not following order to show cause guidelines, and overemphasizing L.L.'s past behavior. We disagree.

In considering a juvenile's sentence modification request, the Supreme Court held that trial courts must conduct a balancing test by

> evaluat[ing] the circumstances of each case. They may consider all relevant factors raised by the parties, including those set forth in N.J.S.A. 2A:4A-43(a) and the youth's conduct while in JJC custody. Judges must also consider health concerns brought on by COVID-19 and their impact on the particular resident's health condition.
>
> [Id., 242 N.J. at 395.]

A-0086-20T4

Here, the court incorrectly determined the sentence modification "inquiry for juveniles is [a] three-fold" test. Nevertheless, consistent with In re Request to Modify Prison Sentences, the court balanced the circumstances of L.L.'s situation, finding the impact of COVID-19 health concerns on L.L.'s medical condition did not "outweigh the factors set forth in N.J.S.A. 2A:4A-43(a) and [L.L.'s] conduct while in JJC custody." The court found seven of the statute's eleven factors were "applicable to [L.L.] and d[id] not support a modification of disposition." The court found factor (1) weighed against L.L. as the "nature and circumstances of the underlying offenses caused harm to victims and property alike." N.J.S.A. 2A:4A-43(a)(1). The court found factors (2) and (9) were established because L.L.'s actions impacted "the . . . victim because his car was stolen, never returned, and utilized during a residential robbery" and that this, too, tilted against L.L. N.J.S.A. 2A:4A-43(a)(2), (9). The court determined factor (3) was satisfied based on L.L.'s "history of delinquency and behavior in court programs and [case management order] services." N.J.S.A. 2A:4A-43(a)(3). (Da7) As for L.L.'s six months of good behavior prior to the hearing, the court found it was "an uncertain predictor to rely upon given the risk to public safety" given his history of delinquency.

The court determined L.L.'s health and safety have been properly addressed by the JJC through monitoring and testing, and there was no indication that his release would render him free from exposure to the virus. Yet the court's finding that he is no safer at home than in JJC custody is not clear from the record. While the court did not fully examine the nature of L.L.'s medical vulnerability or provide particularized analysis of his condition in the context of COVID-19, we suspect it is due to the shortcomings of L.L.'s proofs.

While Dr. Bhise recommends L.L.'s participation in the AMPS rehabilitation program, he does not clearly state that L.L.'s condition will worsen and affect his long-term health if he does not receive the treatment. The doctor does not unequivocally represent that the program would be unavailable to L.L. upon his release from JJC's custody. Dr. Bhise merely states that L.L. "may not be able to access the program if he is released in early 2022" and he "may be negatively affected for his lifetime if he is not able to access this program before turning 21." And Dr. Bansil fails to explain how L.L. is in imminent danger of deteriorating health due to the conditions at his JJC residence.

Given the lack of medical certainty that we look for in considering a doctor's expert opinion, L.L., to date, has not presented proof that contracting COVID-19 has increased the risk to his health. Even the supplemental

information concerning the increased rate of the virus among JJC residents and staff, together with his recent infirmary stays and hospital visits, do not alter our thinking because there is no showing that L.L.'s health is at a greater risk. There is no indication that an increase of COVID-19 infection has occurred where L.L. is committed. And as the State contends, L.L.'s request is further weakened by the fact that he was aware of the AMPS program well before his commitment, but he did not take advantage of its benefits.[2] L.L. proffered no justification for his delay in pursuing the treatment. Balancing the lack of proof that COVID-19 will exacerbate L.L.'s health, we see no undue emphasis on his history of juvenile delinquency as L.L. argues. Such reliance is consistent with N.J.S.A. 2A:4A-43(a)(3) and In re Request to Modify Prison Sentences, 242 N.J. at 395.

While L.L. raises legitimate concern regarding JJC's failure to follow Dr. Bhise's gabapentin prescription and delays in securing appointments and treatment with specialists outside of his JJC residence, this does not persuade us that the agency cannot care for his needs or that his health has been negatively impacted due to COVID-19. That said, the parties may want to determine the feasibility of L.L. participating in the AMPS program while in JJC's custody.

---

[2] Dr. Bhise's February 2017 report recommended L.L. receive treatment for AMPS.

Based on the record before us, it is uncertain whether this can be reasonably accomplished within the respective protocols of the program and the JJC. The parties must decide if it is practicable.

In sum, the record shows that the court considered L.L.'s medical condition and the impact of COVID-19 on his commitment to the JJC. In view of our deferential standard of review, we see no reason to disturb the court's "without prejudice" denial of the petition. L.L. has the right to renew his application given the fluidity of his medical condition and COVID-19.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-0086-20T4